UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALBERT DIBRITO,

       Plaintiff,

v.

CITY OF ST. JOSEPH, MARK
CLAPP, and RICHARD LEWIS,

       Defendants.

                              /

Case No. 1:14-CV-814

HON. GORDON J. QUIST

## **OPINION**

Plaintiff, Albert DiBrito, was the Deputy Director of the Public Safety Department (PSD) of the City of St. Joseph (the City) until he was terminated on May 6, 2014. After his termination, DiBrito sued the City, its manager, Richard Lewis, and the director of the PSD, Mark Clapp. DiBrito alleges that he was terminated because he reported that Clapp had engaged in misconduct. DiBrito asserts that his termination violated his Constitutional rights under the First Amendment and Due Process Clause, as well as Michigan statutory and common law. Defendants have moved for summary judgment on all counts. For the following reasons, the Court dismisses the federal claims (Counts I and II), and declines to exercise jurisdiction over the state-law claims.

### *Background*

DiBrito retired from a long career with the FBI in 2012. (Dkt. #1 at Page ID#3, ¶12.) Shortly thereafter, DiBrito began work as the deputy director of the City's newly formed PSD, which unified the police and fire departments. (*Id.* at ¶¶ 15, 16.) DiBrito reported to then-City Manager, Frank Walsh, and Clapp, the PSD's director. (*Id.* at ¶¶ 16-18.) From the beginning of his

tenure with the PSD, DiBrito kept notes on certain occurrences, including when Clapp took actions of which DiBrito disapproved. (Dkt. #31-2 at Page ID#164-70.)

On September 17, 2013, an elderly woman called the police department to report that she had a shotgun that she no longer wanted. (Dkt. #31-4 at Page ID#253.) The gun owner gave Officer Tom Vaught permission to destroy or auction the shotgun, and Vaught turned the shotgun over to Clapp. (*Id.*) Clapp decided that he wanted the shotgun for himself, and discussed with several individuals whether he should purchase it. (Dkt. #31-5 at Page ID#275.) DiBrito advised Clapp not to purchase it, but Clapp ignored that advice. (Dkt. #31-3 at Page ID#192.) Instead, Clapp took the shotgun home with him that night. (Dkt. #31-5 at Page ID#275.) The next day, Clapp met the woman who had turned in the shotgun, and they agreed that Clapp would purchase the shotgun for $50. (*Id.*; dkt. #31-4 at Page ID#253.)

Thereafter, DiBrito decided to "check[] . . . some legal issues" related to Clapp's purchase of the shotgun. (Dkt. #31-3 at Page ID#193.) DiBrito was unable to find a city policy that prohibited Clapp's purchase. (*Id.*) On October 7, 2013, DiBrito called Assistant U.S. Attorney Donald Daniels, who told DiBrito that Clapp did not violate federal law. (*Id.*) At that time, DiBrito chose not to report Clapp's actions to Lewis, who had taken over as City Manager a couple months prior to Clapp's purchase, because Lewis was new to his position. (*Id.*)

Tensions between DiBrito and Clapp continued after the September 2013 disagreement. On January 23, 2014, DiBrito had a disagreement with Jim Crowe, who was his command equal on the fire department side of the PSD. (Dkt.#31-3 at Page ID#193.) Crowe believed that DiBrito had a role in Crowe having been rejected from a police chief training program. (*Id.*) On January 24, 2014, DiBrito had a discussion with Clapp about the Crowe issue. (*Id.* at Page ID#194.) Clapp said that he would fire DiBrito if Clapp learned that DiBrito had a role in Crowe's rejection. (*Id.*)

2

That same day, Clapp met with Officer Vaught about a decision not to promote Vaught. (Dkt. #31-5 at Page ID#278.) Vaught told Clapp that he thought the process had been unfair, and Clapp responded that the process for filling DiBrito's position had been more unfair. (*Id.*) Clapp explained that Walsh (the former city manager) had hired DiBrito even though other candidates had superior qualifications. (*Id.*) Clapp went on to say that DiBrito had investigated Walsh, and that DiBrito had agreed to drop the investigation in exchange for Walsh promising DiBrito a job and money for a project DiBrito supported. (*Id.*; dkt. #37-7 at Page ID#684, 693.)

Vaught told DiBrito about Clapp's comments. (Dkt. #37-7 at Page ID##684, 695.) On January 26, 2014—the first business day after Clapp threatened to fire DiBrito and DiBrito learned about Clapp's comments to Vaught—DiBrito filed a formal complaint with Lewis regarding Clapp's shotgun purchase, which had occurred four months earlier. (Dkt. #37-4 at Page ID#633). DiBrito described the incident, and stated that the U.S. Attorney's office had told DiBrito that there was no violation of federal law, and that DiBrito could not locate any policy prohibiting Clapp's actions. (*Id.*) Nonetheless, DiBrito recommended that Lewis contact the Michigan State Police to investigate. (*Id.*) DiBrito did not mention Clapp's comments to Vaught in that complaint, but told Lewis about the comments the following day. (Dkt. #31-3 at Page ID##197-99.)

Following DiBrito's complaint, Lewis undertook an investigation of the shotgun incident and placed Clapp on administrative leave. (Dkt.#31-10 at Page ID#342-43.) During that investigation, Lewis and John Hodgson, the City's Community Development Director, interviewed a number of City employees, and Hodgson memorialized those interviews in a memorandum. (*See* dkt. #31-8 at Page ID#317-31.) Lewis sent a copy of DiBrito's complaint to the Michigan State Police, who responded with a letter stating that it would not conduct a criminal investigation because "the elements to prove that a crime was committed and prove it beyond a reasonable doubt to a jury

would be extremely unlikely." (*Id.* at Page ID#361; dkt. #37-13 at Page ID#738.) Lewis also determined that no city policy prohibited Clapp's conduct, and that such activity had long been accepted within the police department. (Dkt. #37-5 at Page ID#637-38.) Lewis concluded that the City should have a policy against such purchases, however, and directed DiBrito to take the lead in drafting such a policy. (*Id.*; dkt.#31-10 at Page ID#345.)

The investigation left Lewis "troubled by the background of the complaint." (Dkt. #37-5 at Page ID#640; dkt. #31-10 at Page ID#351.) Lewis felt that DiBrito should have come to him earlier if he was concerned about a potential legal or ethical issue, and that DiBrito's excuses for not doing so were incredible and inadequate. (*Id.*) Lewis further believed that DiBrito's "own words and statements" indicated that he knew that Clapp had not violated the law. (*Id.*)

Lewis had learned during the course of his investigation that there were a number of management issues within the PSD, and determined that a third-party investigation was necessary. (Dkt. #31-10 at Page ID#346-48.) The City hired Theresa Smith Lloyd from Plunkett Cooney to conduct the investigation. (*Id.* at Page ID#350.) Lloyd interviewed a number of City employees and submitted a report on April 28, 2014. (Dkt. #31-12 at Page ID#409.) The report concluded that Clapp's statements to Vaught regarding how DiBrito got his job were "inappropriate statements for a commanding officer to make regarding a second in charge," and that the "issue should be dealt with appropriately within the department." (Dkt. #31-12 at Page ID#449.) It went on to state that many employees had raised issues regarding DiBrito's "honesty, inappropriate statements to subordinates regarding a commanding officer, favoritism, and retaliation," and that such issues "must be addressed with DiBrito." (*Id.*)

On May 6, 2014, Lewis terminated DiBrito and suspended Clapp for five days without pay. (Dkt. #37-10 at Page ID#728.)

4

*Legal Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

*Discussion*

**1.     First Amendment**

A plaintiff alleging a claim of First Amendment retaliation must demonstrate that (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from engaging in such conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012).

    A.     <u>Constitutionally Protected Conduct</u>

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 1958 (2006) (citation omitted). "However, public employees do not forfeit all their First Amendment rights simply because they are employed by the state or a municipality." *Handy-Clay*, 695 F.3d at 539. "[T]he First Amendment protects a public employee's right, under certain circumstances, to speak as a citizen on matters of public concern." *Id.* However, "when a public employee speaks not

5

as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 1690 (1983).

In addressing First Amendment claims, courts must keep in mind that "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *City of San Diego v. Roe*, 543 U.S. 77, 82, 125 S.Ct. 521, 525 (2004). The Supreme Court's decisions "have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Garcetti*, 547 U.S. at 420, 126 S.Ct. at 1959. The premise underlying these decisions is "that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance process.'" *Id.* (quoting *Connick*, 461 U.S. at 154, 103 S. Ct. at 1694).

The Supreme Court has established a three-part test to balance the interests at stake. To establish that he engaged in protected conduct, a plaintiff must demonstrate that (1) his speech was made as a private citizen, rather than pursuant to his official duties; (2) his speech involved a matter of public concern; and (3) "his interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in promoting the efficiency of the public services it performs through its employees." *Handy-Clay*, 695 F.3d at 540 (internal quotation marks omitted).

DiBrito alleges that he made two statements that constituted protected conduct: the complaint about Clapp's statement to Vaught and the complaint about Clapp's purchase of the shotgun. DiBrito argues that his complaint about Clapp's statement to Vaught constituted protected conduct

6

because it was aimed at "protecting the operation of the PSD by getting Clapp to stop undermining him by defaming him to mutual subordinates." (Dkt. #37 at Page ID#584.) DiBrito argues that his complaint about the shotgun purchase constituted protected conduct because it "alerted Lewis to the misappropriation of public property by Clapp, a public concern in that he was calling attention to the misconduct of a public official." (*Id.* at Page ID#581.)

        1.      Speaking as a Private Citizen

The First Amendment does not insulate a public employee from employer discipline when the employee makes a statement pursuant to his official duties. *Garcetti*, 547 U.S. at 421, 126 S.Ct. at 1960. As the Supreme Court explained in *Garcetti*:

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id.* at 421-22, 126 S. Ct. at 1960.

In *Lane v. Franks*,--- U.S. ---, 134 S. Ct. 2369 (2014), the Court made clear that the exception from First Amendment protection outlined in *Garcetti* is a narrow one. The Court explained that the *Garcetti* exception does not apply to "speech that simply relates to public employment or concerns information learned in the course of public employment," but that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379. As the Sixth Circuit has explained, "[a]fter *Lane*, the *Garcetti* exception to First Amendment protection for speech . . . must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015).

DiBrito's report that he believed Clapp had committed a crime that required further investigation was made in furtherance of his responsibilities as the deputy director of the PSD. As the second highest ranking law enforcement officer in the City, DiBrito's official duties (as specified

7

in his job description) included coordinating with federal and state law enforcement personnel in the investigation of crimes. (Dkt. #31-15 at Page ID#550.) DiBrito's complaint to Lewis, which recommended that the Michigan State Police investigate Clapp's conduct, thus fell squarely within the official duties of DiBrito's position.

"[DiBrito] did not act as a citizen when he went about conducting his daily professional activities [.] . . . When he went to work and performed the tasks he was paid to perform, [DiBrito] acted as a government employee." *Garcetti*, 547 U.S. at 422, 126 S. Ct. at 1960. Thus, when DiBrito reported his suspicions of criminal activity for the purpose of coordinating an investigation with the Michigan State Police, he acted as a government employee rather than a private citizen. Accordingly, the First Amendment did not protect DiBrito from discipline for making such report.

Given recent statements from the Supreme Court and Sixth Circuit regarding the limited nature of the *Garcetti* exception, the Court cannot say with certainty that DiBrito's complaint regarding Clapp's statement to Vaught fell within his official duties. Nonetheless, because the complaint did not relate to a matter of public concern, the Court need not determine whether the *Garcetti* exception applies to that statement.

### 2. Matter of Public Concern

Even where an employee speaks out as a private citizen, his speech is not protected unless it related to a matter of public concern. "In general, a matter of public concern is a 'matter of political, social, or other concern to the community.'" *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999) (quoting *Connick*, 461 U.S. at 146, 103 S. Ct. at 1690). In evaluating a First Amendment claim, courts must "distinguish matters of public concern from internal office politics." *Id.* "'The mere fact that public monies and government efficiency are related to the subject of a public employee's speech do[es] not, by [itself], qualify that speech as being addressed to a matter of public concern.'" *Id.* (quoting *Barnes v. McDowell*, 848 F.2d 725, 734 (6th Cir.1988)).

8

> The Supreme Court has explained:
>
> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable. . . . [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state.

*Connick*, 461 U.S. at 146-47, 103 S. Ct. at 1690 (internal citations omitted). To determine whether speech involves a matter of public concern, courts consider the content, form, and context of the statement in light of the record as a whole. *Id.* at 147-48, 103 S. Ct. at 1691.

In *Connick*, the Court addressed a First Amendment claim brought by an assistant district attorney. The plaintiff, upon learning that she was going to be transferred, submitted a survey to her coworkers that addressed various office management issues. The Court found that, with the exception of one question, the focus of the survey questions—which addressed trust in various supervisors, level of office morale, and the need for a grievance committee—was merely an "extension[] of [the plaintiff's] dispute over her transfer" as opposed to being of "public import in evaluating the performance of the District Attorney as an elected official." *Id.* at 148, 103 S.Ct. at 1690. The Court noted that the survey "did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases[,]" nor "seek to bring to light actual or potential wrongdoing or breach of public trust." *Id.* at 148, 103 S. Ct. at 1690-91. The one question that the Court found did touch on a matter of public concern addressed whether district attorneys ever felt pressured to work on political campaigns. *Id.* at 149, 103 S. Ct. at 1691. In making such finding, the Court noted the

9

"demonstrated interest" by the public that government service depend on merit rather than political service, as well as the potential for employees to be coerced in a way that violated their fundamental rights. *Id.*

Following the decision in *Connick*, the Sixth Circuit has held "mere assertions of incompetence and poor management decision-making to be run-of-the-mill employment disputes—particularly when the recommended course of action would benefit the employee." *See Boulton*, 795 F.3d at 532 (listing cases). Speech addresses a matter of public concern, however, "when it alleges corruption and misuse of public funds, failure to follow state law, major state policy decisions, or discrimination of some form." *Id.* (internal citations omitted).

DiBrito's complaint about Clapp's comment to Vaught falls within the realm of employee grievances that are not protected by the First Amendment. DiBrito's complaint that Clapp was unprofessional and incompetent did not rise to the level of a public concern simply because it concerned a public official. DiBrito asserts the complaint addressed "the very real possibility of disruption" to a public entity, but such argument could be made about any statement alleging incompetence within a public office. As the Supreme Court said in *Connick*:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick*, 461 U.S. at 149, 103 S. Ct. at 1691. Because the complaint about Clapp's comment to Vaught concerned a run-of-the mill employment dispute, it did not address a matter of public concern.

The complaint about the shotgun purchase is less clear-cut because speech that alleges a failure to follow state law generally addresses a matter of public concern. *See Boulton*, 795 F.3d at 532. However, because that complaint was made pursuant to DiBrito's official duties as deputy

10

director of the PSD, rather than as a private citizen, the Court need not determine whether it addressed a matter of public concern.

### 3. Balancing

Even if DiBrito could show that his complaints to Lewis were made by a private citizen and related to a matter of public concern, he would have to satisfy the balancing test established in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731 (1968). Under that test, a public employee must demonstrate that his "free speech interests outweigh the efficiency interests of the government as employer." *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). "Considerations involved in this balancing test include whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 295 (6th Cir. 2012) (internal quotation marks omitted).

DiBrito's interest in commenting on Clapp's purchase of the shotgun is relatively minor. DiBrito's complaint acknowledged that there was no clear-cut illegality, and the fact that DiBrito waited more than four months to report the incident undermines any claim that he had a strong interest in doing so. The City's interest in promoting a working PSD, however, was significant. During the course of investigating DiBrito's complaints, Lewis realized that there was serious dysfunction within the PSD, and that Clapp and DiBrito could no longer work together. After reviewing Lloyd's report, Lewis learned that numerous officers within the PSD also had serious complaints about DiBrito's management. Thus, by the time Lewis decided to terminate DiBrito's employment, he believed that he had a dysfunctional PSD, and that such dysfunction was in large part attributable to DiBrito's presence within the PSD. The City's interest in terminating DiBrito,

11

and resolving the management issues within the PSD, thus outweighed any interest DiBrito had in speaking about his belief that Clapp violated state law or that Clapp had defamed him.

      B.     <u>Substantial or Motivating Factor</u>

Even if DiBrito could demonstrate that he engaged in protected conduct, he must also show that his protected speech was "a substantial or motivating factor" in the decision to terminate him. *Handy-Clay*, 695 F.3d at 545. The Sixth Circuit has interpreted a motivating factor to mean "one without which the action being challenged simply would not have been taken." *Id.* (internal quotation marks omitted). "In order to establish a causal connection between the protected conduct and the adverse action, [a] plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse action] would not have occurred but for his engagement in protected activity." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010). A plaintiff may produce "direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action that may create an inference of causation." *Id.*

DiBrito made the complaints at issue on January 26, 2014. Following those complaints, Lewis conducted his own investigation. After that investigation was completed, Lewis concluded that Clapp's purchase of the shotgun—while not prohibited by law or policy—was inadvisable and should be prohibited in the future. Lewis's investigation also revealed management issues within the PSD, particularly between Clapp and DiBrito, which Lewis believed necessitated a third-party investigation. DiBrito was ultimately terminated after that investigation was completed—over three months after he made the complaints that form the basis of this suit.

DiBrito has no direct evidence that his termination was motivated by his allegedly protected conduct. Rather, DiBrito relies on a single piece of circumstantial evidence— a statement that Clapp made on February 24, 2014, indicating that Clapp and Lewis were in agreement that DiBrito

12

"ha[d] to go." (Dkt. #37-7 at Page ID#707.) DiBrito argues that such statement, which was made before the Lloyd investigation commenced, demonstrates that the investigation was simply a cover to allow Lewis to fire DiBrito.

Clapp's February 24, 2014 statement does little to support DiBrito's case because it provides no indication as to why DiBrito "had to go." The statement was made almost a month after DiBrito's initial complaint, at which point Lewis had already concluded that DiBrito's shotgun complaint raised an important issued that warranted a change in City policy. Lewis had also completed his own investigation at that point, which left him with the belief that there were serious management issues within the PSD. Specifically, it was clear that DiBrito and Clapp could not work together in the future. Thus, the fact that Lewis may have decided to terminate DiBrito after his investigation concluded, but before the Lloyd investigation was concluded, does not indicate that the decision was made on the basis of DiBrito's complaints.

DiBrito has failed to provide sufficient evidence that his complaints about Clapp were a substantial or motivating factor in the decision to terminate DiBrito's employment. Rather, all the evidence indicates that Lewis agreed with the substance of DiBrito's complaints, and he acted to resolve the issues that those complaints raised. In the process of investigating DiBrito's complaints, however, Lewis learned of serious management issues within the PSD that led to the decision to terminate DiBrito. The fact that Lewis may have concluded that DiBrito should be terminated one month after receiving DiBrito's complaints does not demonstrate that such conclusion was based on the complaints themselves. Stated another way, the mere fact that Lewis may have made the decision to terminate DiBrito a month after receiving his complaints is insufficient to demonstrate that such action would not have taken place in the absence of such complaints. Because DiBrito cannot demonstrate a causal connection between his alleged protected conduct and his termination, his First Amendment claim fails.

C. Qualified Immunity

Lewis and Clapp argues that, even if the Court finds a constitutional violation, they are entitled to qualified immunity. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane*, 134 S. Ct. at 2381 (internal quotation marks omitted). Under the qualified immunity doctrine, a government official that violated a constitutional right cannot be held liable unless the right was clearly established when the official acted. *Id.*

After the Supreme Court's decision in *Garcetti*, the Sixth Circuit instructed courts to look to a number of factors to determine whether an employee's speech was made pursuant to his official duties. *Handy-Clay*, 695 F.3d at 540. These factors included the impetus for the plaintiff's speech, the setting of the speech, the speech's audience, the speech's general subject matter. *Id.* The court further advised courts should consider whether statements were made up the chain of command, whether statements were made inside or outside the workplace, and whether statements concerned the subject matter of the speaker's employment. *Id.* at 540-41.

The Sixth Circuit also held that most jobs have an inherent duty of internal communication. *See Boulton*, 795 F.3d at 533. Relying on that reasoning, the court held that a park ranger's statements to a personnel consultant hired by his employer were not made as a private citizen. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir.2007). Similarly, the court held that the *Garcetti* exception applied to a memorandum from a police officer to his chief about the wisdom of a pending staff reduction, *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir.2007), and a teacher's complaints to her supervisors about her class sizes, *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348–49 (6th Cir.2010).

In 2014, the Supreme Court made clear that the *Garcetti* exception must be construed narrowly. *Lane*, 134 S. Ct. 2369. The Court clarified that such exception does not apply to speech

14

that "simply relates to public employment," but only to speech that "is itself ordinarily within the scope of an employee's duties." *Id.* at 2379. Given the limitations outlined by the Supreme Court, it is not clear whether the Sixth Circuit's prior cases describing the *Garcetti* exception are still good law. *See Boulton*, 795 F.3d at 533 (noting that applying that *Garcetti* exception had proven "challenging" prior to the decision in *Lane*).

The actions at issue in this case occurred after the Supreme Court's decision in *Garcetti*, but before the decision in *Lane*. Given the relatively expansive view of the *Garcetti* exception at that time, Lewis and Clapp could reasonably have believed that such exception applied in this case. Specifically, in light of the fact that DiBrito's speech was a form of internal communication, and that it addressed the subject matter of his employment, Clapp and Lewis could reasonably have believed that it was made as part of DiBrito's official duties, rather than in his capacity as a private citizen. Furthermore, because the complaints did not allege clear-cut illegality, and concerned an internal dispute among managers, Clapp and Lewis could reasonably have believed that they did not address a matter of public concern.

D. *Monell* Liability

"A municipality cannot be liable for the constitutional torts of its employees; that is, it cannot be liable on a respondeat superior theory." *Powers v. Hamilton Cnty. Public Defender Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007). To hold a municipality liable, a plaintiff must demonstrate that "the municipality engaged in a 'policy or custom' that was the 'moving force' behind the deprivation of the plaintiff's rights." *Id.* (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978)). In this case, DiBrito's claim relies solely on the actions of City employees that are unique and personal to him. He does not and cannot point to any City policy or custom that motivated such actions. Accordingly, DiBrito's claim against the City fails.

**2.	Due Process**

DiBrito asserts that his termination violated his rights under the Due Process Clause. Although it is not clear whether such claim is based upon substantive or procedural due process, it is ultimately irrelevant because each type of claim fails.

The Sixth Circuit has held that a First Amendment retaliation claim may not be conflated with a substantive due process claim. *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 (6th Cir. 1999). "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* (internal quotation marks omitted). DiBrito's claim is properly analyzed under the First Amendment, and cannot be asserted as a substantive due process claim.

DiBrito also appears to argue that he has a due process claim based on an injury to his reputation, good name, honor, or integrity. *See Med Corp. v. City of Lima*, 296 F.3d 404, 414 (6th Cir. 2002). A plaintiff can sustain such a claim only if he can show: (1) the allegedly stigmatizing statements were made in connection with the loss of a governmental right, benefit, or entitlement; (2) the defendant made defamatory statements that would prevent the plaintiff from taking advantage of other employment opportunities; (3) the stigmatizing statements or charges were made public; and (4) the charges against the plaintiff were false. *Id.* In this case, the allegedly stigmatizing statement—Clapp's statement to Vaught—was made months before DiBrito's termination by an individual who did not make the termination decision. Accordingly, DiBrito cannot demonstrate that any stigmatizing statement was made in connections with the loss of a governmental right, benefit, or entitlement.

Therefore, Dibrito's due process claim will be dismissed.

### 3. State Law Claims

A district court may decline to exercise supplemental jurisdiction over a state-law claim if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). In exercising its jurisdiction, courts may consider "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S. Ct. 523, 534 (1997). "[W]hen deciding whether to exercise supplemental jurisdiction, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Id.* (internal citations omitted).

The question of whether a district court should assert supplemental jurisdiction "'remains open throughout the litigation.'" *Nails v. Riggs*, 195 F. App'x 303, 313 (6th Cir. 2006) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 727, 86 S.Ct. 1130, 1139 (1966)). "Where a district court exercises jurisdiction over state law claims solely by virtue of [supplemental] jurisdiction and the federal claims are dismissed prior to trial, the state law claims should ordinarily be dismissed without reaching the merits." *Wolotsky v. Huhn*, 960 F.2d 1331, 1338 (6th Cir. 1992). Thus, courts routinely decline to exercise supplemental jurisdiction after dismissing federal claims at the summary judgment stage. *See e.g., Booker v. City of Beachwood*, 451 F. App'x 521, 523 (6th Cir. 2011); *Weeks v. Portage Cnty. Executive Offices*, 235 F.3d 275, 280 (6th Cir. 2000).

DiBrito's state-law claims—which include defamation, tortious interference, and violation of the Michigan Whistleblowers Protection Act—are distinct from DiBrito's federal claims, and would require a thorough analysis of state law. Fairness and comity favor allowing a state court to determine those claims. Accordingly, this Court declines to exercise supplemental jurisdiction over the state-law claims.

*Conclusion*

DiBrito has failed to make out a claim under the First Amendment or the Due Process Clause. Therefore, this Court will grant Defendant's motion for summary judgment on DiBrito's federal claims. In light of the dismissal of all claims over which the Court had original jurisdiction, the Court declines to exercise supplemental jurisdiction over the state-law claims.

An order consistent with this Opinion shall issue.


Dated: March 21, 2016                    /s/ Gordon J. Quist
                                        GORDON J. QUIST
                                    UNITED STATES DISTRICT JUDGE